Your argument in Johnson v. Rankin. Mr. Alford. Sure, go ahead. Let's wait for everybody to be seated. Good morning, your honors. Butcher Alford for the plaintiff and appellant. With me on the brief is my friend and colleague, James Riley. I'd like to begin by thanking the court for granting oral argument in this case. I know it's something the court does sparingly because we think this is a very important case. Not only because it involved the tragic death of a young man at the hands of the government, but because also we believe that the district court really allowed the sacrifice of some core values that go really to the heart of our justice system. And that is the concept that all litigants approach the court equally. And all litigants, irrespective of their character, are entitled to the equal protection of the law. And except in those rare cases, and this was not one, where character is truly an issue, a case should not devolve into a relative contest between the character of the parties. And that's exactly what happened here. And that's evident in the trial court's rulings that we point out to the court in our brief. And I won't repeat them all, but I just want to highlight a few things with the court's permission. And of course, happy to entertain any questions the court may have. The errors here were primarily evidentiary in nature. And as my opponent points out in the brief, and may do so again today, normally evidentiary rulings are reviewed under an abuse of discretion standard. But these aren't normal sort of run-of-the-mill evidentiary rulings. They're ones that really go, again, to the heart of some core legal principles. And this court's case law is clear that where a district court's decision to exclude or admit evidence is animated by a misconception of the law or a misconception of the record, the normal abuse of discretion standard doesn't apply. Instead, it's really a de novo standard of review. And an example of that is this court's ruling in the U.S. v. Rivera case. That's a 2005 case, 412 F. 3rd, 562. And at 566, this court explained, quote, we review evidentiary decisions for an abuse of discretion, but legal conclusions concerning the rules of evidence or the Constitution, de novo. Did the evidence to which you object come in through your own witnesses? Your Honor, there was, you know, this is the concept of whether we open the door to certain evidence, and I think maybe Your Honor is referring to the fact that, you know, one of the key issues. I mean, it seemed to me that a great deal of what you objected to had to do with the presence of alcohol. And, you know, but alcohol was front and center in the case, and I thought that the heart of your case was that the blood alcohol level prevented the plaintiff from charging the officer. So much of what or some of what you objected to, which is the plaintiff's alcoholism, was introduced through your own witnesses. Well, Your Honor, that's a crucial point, and I appreciate the question because I think it's a critical one. It's true that part of the plaintiff's theory of the case was that on the night in question, the decedent, his blood alcohol level was .28, that that blood alcohol level suggested that he was incapable of putting his right hand into his pocket and running at full speed at the officer, and it should have been apparent to the officer that he was highly intoxicated. But that didn't open the door. You know, the defense claims that opened the door to this prior arrest, but it didn't because, you know, the evidence of the prior arrest really was incredibly prejudicial and entirely irrelevant because in that circumstance, it was fundamentally different. It was just fundamentally different in so many ways. That would be a jury question, wouldn't it? Well, Your Honor, it's for the judge to decide whether to say this highly prejudicial evidence is relevant and admissible under Rule 404, and there was no relevance to this evidence other than to attack the decedent's character. I mean, the evidence that came in on this prior arrest. Why wouldn't it be relevant? Because your theory of the case was that the .28 blood alcohol level prevented him from charging the officer, and so the defendant says, no, that's not true. We have the February 11 arrest where the blood alcohol level was above .20, and he was perfectly in control. He has a high tolerance for alcohol. The tolerances for alcohol vary widely among individuals, and so if you're going to bring this issue up and say he didn't have a high tolerance for alcohol, the defendant's entitled to counter it and say, yes, he did have a high tolerance for alcohol and was perfectly capable of controlling his actions or directing his actions. Maybe the jury buys it, maybe the jury doesn't buy it, but what's wrong with joining the issue and letting the jury resolve it? Important question, Your Honor. Let me address it, if I might. Because this prior incident was fundamentally different, and the evidence that came in, much of it was totally- Isn't that a jury question? Well, Your Honor, it's for the court to be the gatekeeper of this kind of fundamentally prejudicial evidence, and this evidence that came in involved things that had nothing to do with the issues identified by Your Honor, nothing whatsoever to do with his capacity to charge the police. That was the question. At .28, did he have the capacity to run full speed at this officer? The prior incident was .22, and the difference between .22 and .28 is essentially the difference between stone-cold sober and too drunk to drive an automobile. Now, that goes to the weight of the evidence. Fair enough, but doesn't that go to weight as opposed to admissibility? It may, Your Honor, but there are fundamental aspects of that prior arrest that came in that had nothing to do with any issue in this case. The prior arrest did not involve him charging at the officer, and also the evidence that came in involved- I mean, the most prejudicial aspects of that prior arrest that came in had nothing to do with his interaction with the officers at all, really. It had to do with the- The evidence came in that he punched through this glass window before the officers arrived, that he wrote a threatening symbol in his own blood on his girlfriend's door, that he threatened to kill her. All that stuff has nothing to do whatsoever with how he might interact with the police at .28. It served no purpose other than to paint him as a person of ill character, and once that evidence came in, the trial was effectively over. The defense will argue that's relevant to notice, but notice wasn't an issue in the case. This case wasn't tried on the basis that the decedent had no notice that he might be shot if he charged the police when they were pointing a gun at him. That wasn't what this case was tried about. It was tried about whether, in fact, this incident happened, as described by the officer who was the sole witness to it. Really, in these kinds of cases, the Supreme Court's jurisprudence in Graham suggests that the focus ought to really be on the officer, and what did the officer know? What did he believe at the time? What was in his head, not what was in the plaintiff's head? Self-defense was the issue, and really that's what are the circumstances as perceived by the officer, not the circumstances, this concept of notice wasn't even an issue in the case. All this incredibly prejudicial evidence came in that has nothing to do with the concept of any of the issues legitimately in the case. That's why we think that situation is... Excuse me, maybe I'm misunderstanding what your position was, but I thought your position at trial was that the gentleman that was shot didn't have the capacity to be a threat to the police because he was so drunk. That's essentially right, Your Honor, that he was so highly intoxicated, and it wasn't really a matter of tolerance. We didn't introduce the concept of tolerance. That was introduced by the other side. It was simply that the witnesses who observed his behavior on that day suggested that... And the only eyewitness, the most important eyewitness, was the young lady who called the police, and she said that he was hanging by the door, barely able to stand, and his legs were all like jelly. That's how she described him. That's what I thought the evidence was. So then, interdiction of this, and how long before this had had the prior incident occur? Some months. I believe it was three months. The incident in question, this fatal shooting occurred on April 23, this prior incident in February. So at that time, with less alcohol, which of course you could argue, and I'm sure, I don't think you handled it below, did you? No, I didn't handle the trial. Well, but it's your case now. That's right, that's right, I own it. As you could have, and your colleague did, I assume, argue below, the difference in alcohol makes a huge difference, but at that earlier time, the decedent had the capacity to indeed be threatening. Well... That's what that evidence showed. I mean, I don't know what notice, exactly what you're getting. I agree with you. I'm not sure that this is a notice issue. Right, right. Under fundamentally different circumstances, though, Your Honor, there was no allegation that, in any way in that prior incident, there was no allegation that he charged the police. There was no allegation that he ran at the police. There was no allegation... I don't see the issue of law here that would let us say there was some sort of abusive discretion because it was a violation of law. It seems to me like this is just a garden-variety judgment call as to how relevant the issue is and whether it just goes to character or whether it goes to some issue before the jury in the trial. And the trial judge says, no, it's not just character evidence. It goes to an issue of, as my colleague puts it, capacity. But isn't that the kind of judgment call that a trial court would make every day? Well, Your Honor, the trial court has to be the guardian and the gatekeeper of this incredibly prejudicial evidence. And, again, this evidence really was so prejudicial. Well, all evidence that's brought in against you is prejudicial. The very nature of the adversary process is that one side seeks to introduce evidence that's prejudicial to the other, but that doesn't answer the question. But under analogous circumstances, this court in KOPF, the Kopp case, found that the admission of evidence of prior bad acts of the plaintiff in an excessive force case was exactly what required a reversal because it is so highly prejudicial and it is so irrelevant to the issues. And that's what I think may be getting lost here is in that prior arrest, there was no allegation that he charged at the police officer. There's no allegation of anything like what happened here. It's fundamentally different. That's a jury argument. Well, it is, but it's more than that, Your Honor. It's also an argument that the judge has to decide, the district judge has to decide, is this evidence relevant? Rule 404 suggests that this evidence should not come in unless it's really relevant to some issue in the case, and this was not. And it was not the only error, Your Honor. I don't want to lose sight of the fact that there were other fundamental errors here, particularly the exclusion of the autopsy photo, which was the key issue in the case. I mean, the key issue in the case was the position of the decedent's hand at the time of the shooting. And this was a key photo that went right to that issue. And the coroner, Dr. Penison, who performed the autopsy, she said she thought it was more likely than not that the bullet entered through the palm surface of the hand. That whole line of inquiry seemed to me to be highly speculative. Well, Your Honor, she did testify, and it's in the record, that she thought it was more likely than not because of certain skin tags on the wound. It was more likely than not, and that's a fairly high standard, that she thought the bullet entered the palm surface and not the back surface. How long did this trial last? Three days, Your Honor. It was quite expedited. Three days? Three days. It was quite expedited. And the verdict of the jury came back great. You had two weeks to put on your case, didn't you? How soon did the jury verdict come back? It came back very quickly, Your Honor. It was less than a day. And because it was a foregone conclusion given this prejudicial evidence. But the key evidence was this photo. I mean, it went to the heart of the case, Your Honors. It went to the heart of the case. I mean, that's one thing that all sides agree on in this case, is that was the crucial issue in the case. And the court excluded this photograph. And, again, that wasn't a discretionary ruling either because that was based on a fundamental misconception of the law and the record. It's clear from the record that the trial court excluded this photo because the trial court believed erroneously, as a matter of law, that photographs are not admissible unless they assist the witness's testimony. And that's simply not the law. The law says that photographs are silent, independent evidence of what they portray. So irrespective of whether they assist the witness in his or her testimony, they ought to be admissible if relevant. And this one was not only relevant, it was crucial to the key issue in the case. Well, I've looked at what I think that document is, and I must say it doesn't seem to me that it is dispositive of the question of where the bullet entered. And your witness, your side's witness, wasn't prepared to testify to that. I guess she was unsure. Well, Your Honor, it wasn't that she was unsure. She said she couldn't be certain, but the law, of course, doesn't require certainty. I regard unsure and uncertainty as synonyms. Show what goes, God. Do what you want. I'm sorry to interrupt, Your Honor. No, that's okay. Go ahead. I'm almost out of time. But, you know, the photo was a key aspect. This is at 2572. Is that photo? Yes, Your Honor. Let's see. If I may, even though I'm almost out of time, just briefly respond to this question. She specifically said that it was more likely than not, that's it, at the joint appendix 2224 to 2225. She said it was more likely than not, based on these skin tags, that the – Right. She wasn't certain. Right. And she said the photo displayed the skin tags that she wanted to explain to the jury. And the jury was not able to see the photo that helped illustrate her testimony. You have some rebuttal time. Sorry, Your Honor. So unless the Court has any questions, I reserve the rest of my time for rebuttal.  Thank you. Mr. Cromwell. May it please the Court. My name is Richard Cromwell on behalf of Officer Stephen Rankin, and seated with me is my colleague, Kenneth Abrams, who helped me try the case to the District Court below. Plaintiff's central theme in the case below was that Dinyonkin was mentally and physically incapable of attacking Officer Rankin in the way that he described because Dinyonkin was too intoxicated. The plaintiff could have started this case, like most other excessive force cases, at the moment of arrest. But the plaintiff made a tactical decision in this case to start much earlier in the day so that it can describe how much Dinyonkin had to drink and the effect that that alcohol had on him to support their theory of the case that he was too drunk to have the mental or physical capacity to attack Officer Rankin. Plaintiff introduced evidence that he had consumed a large amount of evidence, a large amount of alcohol, that he could not walk, that he stumbled, staggered, fell into things, was unable to communicate, unable to speak with people, unable to understand what people were saying to him, that he had urinated on the floors, that he had passed out several times, that he had to be carried out of an apartment while he was noncommunicative. Plaintiff introduced the expert testimony of a forensic toxicologist who opined that Dinyonkin had a BAC of 0.28 and that he was severely impaired in his mental and physical functions, impaired in his attention, ability to focus, attention and response to environmental changes, impaired judgment, decision making, reasoning, motor coordination, trouble with balance, slurring and staggering. Plaintiff placed Dinyonkin's mental and physical capacities while highly intoxicated at issue in this case. Thus, prior acts under 404B showing exactly what Dinyonkin's mental and physical capacity was while highly intoxicated became highly relevant to Officer Rankin's defense of this case so that he could show that Dinyonkin could in fact have the mental and physical capacity to attack him exactly as he described on the night of the incident. On February 21, 2011, Dinyonkin was arrested at 8 in the morning with a BAC of 0.22. At no time did the plaintiff attempt to draw any distinction between how somebody would act at a 0.22 versus a 0.28, so that issue never came up. Both of the experts, Officer Rankin's forensic pathologist and toxicologist and the plaintiff's toxicologist, considered all of the evidence in relation to the prior incident and forming their opinions in the case and were subjected to cross-examination based on their review of the evidence. So the jury did not hear this evidence for the first time through Officer Rankin's witnesses. They actually heard it the first time through his own forensic toxicologist. Despite having a point... This evidence isn't in that category, is it? No, ma'am. Would you like me to address that at this point? You can do it at your leisure, but I just don't... I didn't want to leave the... I wanted you to at least acknowledge and perhaps address at your leisure something that doesn't go under this general argument you're making. And I will get to that as I wrap this up. Despite this high BAC on February 21 at 8 a.m., Dinyonkin demonstrated the mental and physical capacity to attempt to break into a house, which, by the way, is exactly what Officer Rankin was called to respond to on the night of the incident, draw symbols, flee when the police were advancing, walk down the street without staggering, communicate in two different languages, speak English clearly and without slurring, resist officers' attempts to keep him in place, and to form the intent and clearly communicate threats of physical harm. So clearly this evidence showing what Dinyonkin was capable of doing, both mentally and physically, with a very high BAC was highly relevant to rebut the plaintiff's case that he was incapable of attacking Officer Rankin with a high BAC and to support Officer Rankin's case that he did have the mental and physical capacity to attack him. With regard to notice, there was a gross negligence claim made against Officer Rankin. Assumption of the risk is a defense to that. When the police officers approached Dinyonkin on the February 21, 2011 incident, the first thing he did was put his hands inside of his pockets. The police officers drew their weapons and told him to show his hands. He eventually withdrew his hands and was arrested. An officer said, do you know what can happen if you don't show your hands to a police officer? And he said, yes, I could be shot. Let me ask you this. Was there any important evidentiary ruling that you lost at trial? Give me a second, because in preparing for this appeal, there were some things that... Sounds like what President Eisenhower said about Richard Nixon. Give me a week and I'll think of something. Well, there were. I did, Liz. For example, yes, there were several... Yeah, and this is important. Okay. They claimed that Dinyonkin was docile, a non-threatening drunk who could not pose a threat to anybody. And you had all this prior evidence on another occasion that you'd already put in that shows that he's not docile when he's drunk. That's correct. So what important evidentiary ruling did you lose on that point? So when Mr. Wilson and his friend, Louis Mitchell, went back to take Mr. Dinyonkin out of the Wilsons' apartment and to leave him on the street, Mr. Mitchell said, let me get my taser first. And they grabbed their taser and went up there together to bring him out. I thought the fact that people who knew Dinyonkin felt like they had to get a weapon before they removed him from that apartment was evidence that he could... That might have been icing on the cake, but as I read the record here, and I haven't read all of it, and you lived it so you know it better than I do, but there was an awful lot of evidence about this prior incident that seemed to me that pretty much established that he would be threatening when drunk. That's correct. And I thought that the fact that when they went to recover him from the apartment that they got a weapon... That was the little icing on the cake. Yes. Okay. In addition to... Are you going to talk about the Facebook? Yes, I'd love to talk about that. Okay. And the reason why I'd like to talk about a Facebook issue is because it's not an issue on this appeal. Officer Rankin has Facebook postings. They were obtained by the Virginia Pilot. They were given to plaintiff's counsel. They were produced during discovery. The postings were described in the briefs, and unfortunately in the briefs there was more information about the postings than was ever introduced in the record at trial, and I believe that that was a gratuitous and desperate attempt by the appellant. Well, the district court didn't permit the Facebook postings yet. They did not. So there was no way for us to know about it. They had to make a record so that we would know what was at issue. So we moved in Lemonade to exclude the Facebook postings because they were irrelevant to application of the objection. The point is the Facebook postings didn't go to prior instances of excessive force. Did not. And as a result, I guess Judge Smith said under 403, they have a highly inflammatory potential which exceeds the relevance because it doesn't indicate that on any prior occasion Officer Rankin used excessive force. So it probably tips the line more into character evidence rather than something that was the whole idea of 404 is that you don't just want the trial to be on the general character of the individuals involved. You want it to be on some much more specific issue that's joined in the case, and the Facebook evidence didn't clear that hurdle. That's correct, Your Honor, but the plaintiffs agreed with us on the point that it was irrelevant to the liability phase of the trial. We moved in Lemonade to exclude it because it was not relevant to application of the Graham Objective Reasonables Test, which says that you judge a police officer's actions based on the facts and circumstances that were confronting him at that time without regard to his subjective intent. But you remember the footnote in Graham, right? I do. But I gather that that was not argued to the district court. It was not argued. Because it seems to me that that's an avenue under which this evidence could have gotten in. The officer testified, right? Yes, he was called by the plaintiff. So that this Facebook postings that he made might well have been fodder for cross-examination of him, but your position is that the plaintiff's counsel never made that argument in the district court. The plaintiff's counsel never made that argument and, in fact, agreed that the Facebook postings were not relevant to the liability phase of the trial. In the plaintiff's response to my motion in Lemonade, the plaintiff concludes, and this is at 1695 in the record, accordingly, because Rankin's Facebook materials are relevant to the issue of motive and intent as it relates to plaintiff's claims for punitive damages, and because the materials are not unduly prejudicial, they should be admitted at the trial of this matter. They asked that they understood, they agreed with us that this stuff was not relevant to application of objective reasonableness under Graham, but argued... The instruction to the jury was in terms of objective reasonableness? That's correct, Your Honor. The objective reasonableness of the officer's action? That's correct, Your Honor. It was a 1983 action and then gross negligence and battery. So then, so the court... The court bifurcated the trial. Yes. The court did exactly... So the court said, I agree with you. This could be... Or this is relevant to a punitive's case. So the court said, okay, I'm going to let this in. As you asked me to, I'm going to let this in for punitives, but I'm concerned that it could taint the liability and compensatory damages case. So I'm going to bifurcate punitives from liability and compensatory. And plaintiff's counsel did not object to that either. So there is no issue with regard to the Facebook evidence because the court did exactly what plaintiff's counsel asked them to do. And even if they had offered the Facebook evidence at the liability phase or had made some sort of proffer of the Facebook evidence at the liability phase, the court would not have abused its discretion in excluding that because it is irrelevant. And also, under a 403 analysis, it's obviously more prejudicial than probative of any fact that's being presented in this case. This is not a situation where Officer Rankin said his use of force was a mistake. He intended to use force in the manner in which he did. And this is not a situation where he has a long past history of either credibility problems or prior occasions of excessive force. So I believe that there is no Facebook issue because the court did what the plaintiffs wanted to, but even if they had offered it in any way or made a proffer of it, it's irrelevant to application of objective reasonableness. And I do believe, without any context, without any statement as to when it was posted, what were its origins, why was it posted, it's more prejudicial than probative of any of them. Of course, if it had come in, you'd have been totally able to put all that context there. So I don't know that that goes particularly anywhere. The issue is there was never even a proffer as to what it would show. There is no proffer because plaintiffs agreed that it was irrelevant to the, rightly or wrongly, plaintiffs agreed that it was irrelevant to the liability phase of the trial. Anything further, sir? Pardon me? Is there anything further? The only thing that I would want to add is, and I'm glad that Judge Motz took a look at the photograph. The plaintiffs say that this, the exclusion of this photograph, or that this photograph was the single most critical, important piece of evidence at the trial. It is not. If you look at the record, you will see that when the district court took a proffer as to the significance of what this photograph would be from Dr. Kennison at trial, plaintiffs' counsel never showed her the photograph. And then finally, the court showed her the photograph and says, does this help you with your opinions? And she says, no, ma'am. There is no evidence in the record as to what this photograph shows. Well, of course, you put in a bunch of other photographs, or there were a bunch of other photographs in evidence showing the decedent's body bleeding. And one of their arguments, at least, is that this document is more probative than those documents. And I guess your response is, but this one is more prejudicial or something. I don't know what your argument is. The fact of the matter was that there was a shooting, and the court is going to allow evidence of the body on the street. How does this photograph differ from the photographs that were allowed in of the shooting? There's not a single piece of evidence as to why this photograph is relevant or what it shows. They say that they actually tell this court in their briefs that Dr. Kinnison would have testified that this shows the skin tags that she thought might have been important. She doesn't say that at all. I thought the expert herself was queasy over exactly what the import of the photograph even was. It's very uncertain, not confident. And when you look at the photograph itself, I'm actually surprised that this was offered. How long did Rankin testify? I don't have the exact time, but he was on the stand for a very long time. I thought the whole business of photograph and whose hand was where and what bullet traveled where was all sort of highly speculative. I suppose the trial came down fundamentally, didn't it, to a jury assessment of Rankin's credibility? That's correct, Your Honor. And also the statement of the importance of the hand or wound is vastly overstated. Officer Rankin said that he saw Dinyonkin reach into his pants and start charging at him. He saw the hand when he first started firing. When the firing was over, the hand had come out of the pants, and he didn't know when it came out of the pants. So this wound is not indicative of anything because Dr. Kinnison testified she didn't know which shot that wound represented, and she could not opine as to the position or location of the hand at the time that it received the wound. The court made evidentiary decisions on the issues of the claims put in by the plaintiff and the defenses put in by Officer Rankin. I believe that the court had a sound basis for those decisions and did not abuse its discretion so that we would ask that the court affirm the judgment below. Thank you. Thank you very much. Mr. Alford, you have some rebuttal time. Thank you, Your Honor. I'll be very brief, but there are some key issues I'd just like to emphasize very briefly. On the autopsy photo, you know, with all due respect, I think this is a blatant misstatement of the record  In fact, she was asked by the trial court, and this is in the record. It's at 2-2-2-6. She was asked, quote, in camera, quote, Does that photograph, Dr. Kinnison, assist you in making any different conclusion? She had previously testified, and this is critically important too, that she thought it was more likely than not, not speculative, more likely than not, that the bullet entered from the palm to the rear. Key issue in the case. Now, one can argue, well, maybe the hand had already come out of the pants at that point. As Your Honor knows, that all goes to the weight of the evidence, not its admissibility. The jury should have seen this photograph. They should have seen because Dr. Kinnison said it reveals skin tags consistent with her opinion. And so far from her saying it didn't help her, she specifically said it doesn't change her mind. That's what she was asked. So that's a key issue. She said it didn't change her mind. She said it was consistent with her opinion, and it illustrated her opinion. And the fact that she was not 150% certain is all the more reason why the jury should have seen this photograph. And as Your Honor pointed out, there were terribly inflammatory photos that had almost no relevance, showing this poor man's body bleeding on the street, full of holes, and his face contorted. Why in the world would that kind of photograph be admitted and not want a close-up of the hand that could have easily been on a living person with that wound? Not to let that in. And to say that it's inflammatory, well, there's no getting away from inflammatory evidence in a case involving a man who was shot 11 times. And inflammatory is not a legal justification for excluding evidence. It's not. It's not in the evidence code.  That's a key piece of evidence. So I just think it's clear error to exclude this crucial photograph. And it's not a matter of discretion. It's a fundamental misconception of the record and of the law. Now, briefly on the Facebook evidence, I think that's crucial. Your Honor indicated this trial came down to the key issue of Officer Rankin's credibility. I couldn't agree more. And that's exactly why this Facebook evidence should have come in. Now, maybe it didn't involve prior incidents of excessive force, but that's not the only kind of evidence that's admissible. I'm not sure that you've preserved your argument. Well, Your Honor, I believe we did. The argument is that we stipulated to the trial court's ruling. And the record is very clear on that. What we stipulated to, you know, we made an argument that my predecessor did that this evidence is relevant both to liability and to punitive damages. That's in the record at 1695 and 1912. And then when you came to this resolution, did you say, well, we object to, or did you agree with whatever the resolution was? Yes, Your Honor, that's an excellent question. The only thing we agreed to is, and that's in the record too, you know, is once the trial court made clear that it was going to bifurcate liability and punitive damages, the trial court said, well, should we bifurcate? You were perfectly happy to have it come in on punitives. You succeeded in the liability phase. Yes, Your Honor, but we thought it should come in on the liability phase too. Tell me again where it's argued. At 1695 and 1912. And, you know, it's clear that, you know, at 1971, you know, the trial judge is talking about, you know, how they're going to divide up. It's not on 1695. 1695, Your Honor. Yeah, no, I've got 1695. That was the place I was looking at before. It's not reserved there. Well, 1695, the court says. No, this is your, these are your papers, I believe. I'm sorry, Your Honor, that's exactly right. And we say that the Facebook material is irrelevant to the issue of motive and intent as it relates to the claim for punitive damages. But, you know, that wasn't the only reason also. That's what I'm looking for is the other reason. 1912. At 1912, where there's a specific argument, this is an argument on the motion to eliminate, where it says it goes to the issue of recklessness and callousness under the Supreme Court's test. Well, do you stand by that? That it's relevant to, not with regard to punitive damages, but with regard to ordinary damages, that it is relevant to the issue of recklessness or callousness in a 1983 excessive force case? That's not the way the Supreme Court has articulated it, has it? So she would be correct in rejecting that argument. In footnote 12, Your Honor, the court… But that's not recklessness or callousness. Well… That's impeaching the credibility of the officer. Which is always… That's not what you say. Which is always… And I absolutely understand it's not you that's saying it. I understand, Your Honor, but it's clear from the record that I think that it was being offered for both purposes, and the only stipulation was to the court's decision to bifurcate liability and punitive damages, not to the exclusion of this evidence. I'm almost out of time. I'd just like to briefly… Thank you, Mr. Alford. We've given you plenty of time. I think your red light is on, unless my colleagues have further questions. Thank you, Your Honor. I appreciate your patience. We'd like to come down…
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Henry F. Floyd